UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER ANN CLIFFORD,

                Plaintiff,         Civil Action No. 16-11847
                                        Honorable John Corbett O'Meara
                                        Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]

Plaintiff Jennifer Ann Clifford ("Clifford") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Clifford is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be DENIED, Clifford's Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

## II. REPORT

### A. Procedural History

On November 12, 2008, and November 20, 2008, Clifford filed applications for DIB and SSI, respectively, alleging a disability onset date of August 2, 2007. (Tr. 270-79). These applications were denied initially on March 9, 2009. (Tr. 134-41). Clifford filed a timely request for an administrative hearing, which was held on October 5, 2010, before ALJ Lantz McClain. (Tr. 66-88). On December 27, 2010, ALJ McClain issued a written decision denying Clifford's applications for benefits. (Tr. 96-104). On June 22, 2012, the Appeals Council issued an order remanding the case to the ALJ with instructions. (Tr. 108-10).

After a second hearing, this time held before ALJ Paul Jones on November 29, 2012,[1] ALJ Jones issued a written decision on February 1, 2013, again denying Clifford's applications for DIB and SSI. (Tr. 115-24). On August 29, 2014, the Appeals Council again remanded the case with further instructions. (Tr. 130-32).

A third administrative hearing was held on January 7, 2015, before ALJ Thomas Walters. (Tr. 28-65). Clifford, who was represented by attorney Richard Wagner, testified at that hearing, as did vocational expert James Engelkes, Ph.D. (*Id.*). On January 22, 2015, ALJ Walters issued a written decision finding that Clifford is not disabled. (Tr. 14-23). On April 25, 2016, the Appeals Council denied review. (Tr. 1-5). Clifford timely filed for judicial review of the final decision on May 24, 2016. (Doc. #1).

### B. Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

---

[1] The transcript of this administrative hearing has not been produced and is not contained in the record, apparently because the hearing recording was inaudible. (Tr. 130).

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C. Background**

*1. Clifford's Reports and Testimony*

At the time of the 2015 administrative hearing, Clifford was 41 years old, and at 5'6" tall,

weighed 176 pounds.[2] (Tr. 34, 41, 72). She was not married but lived in a house with her parents and her six-year-old son. (Tr. 35, 38, 73, 328). She completed high school but had no further education. (Tr. 34-35, 326). Previously, she worked for a drycleaner (for approximately seven years), and then as a retail associate at Macy's (for a few months). (Tr. 35-37, 318). She stopped working in August 2007 because of her medical condition. (Tr. 37, 75, 318).

Clifford alleges disability primarily as a result of knee pain (right worse than left) and low back pain. (Tr. 41, 44, 318). She also testified that she was experiencing increasing depression but had not sought treatment for this condition. (Tr. 50-51). At the time of the 2015 hearing, Clifford had been using a cane for two years and also had a "full size leg brace." (Tr. 49). Despite her ongoing knee pain, however, her physicians were not recommending knee replacement surgery because of her relatively young age. (Tr. 48).

Clifford is able to care for her personal needs, prepare simple meals, do the dishes, drive short distances, shop in stores for small items, pay bills, and handle a checking and savings account. (Tr. 40, 52, 54-55, 74, 328-31). She testified that she has to lie down five or six times a day, for 30-60 minutes at a time, in order to "take the pressure off [her] knees[.]" (Tr. 44-45). She can sit for only 5-10 minutes at a time; stand or walk for only 15-20 minutes at a time; lift only 5 pounds; and cannot climb stairs. (Tr. 45-46, 73, 79).

    2.    *Medical Evidence*

In May 2008, Clifford saw Dr. Amy Wallace with complaints of knee pain that had persisted for years but was worsening. (Tr. 359). Dr. Wallace noted tenderness and crepitus on examination, and x-rays showed degenerative changes in both knees. (Tr. 359, 361-62).

On June 2, 2008, Clifford presented to Rhonda Whelan, D.O. at Mid Michigan

---

[2] Previously, Clifford weighed as much as 333 pounds before bariatric surgery. (Tr. 41).

Orthopedics. (Tr. 366). On examination, Dr. Whelan noted patellofemoral crepitus bilaterally, tenderness throughout the bilateral knees, and a positive J sign bilaterally with significant lateral tracking of the patella. (*Id.*). She diagnosed severe maltracking patella with chondromalacia of the bilateral knees, as well as moderate-to-severe degenerative joint disease of the bilateral knees; administered injections to both knees; recommended physical therapy; and indicated that patellar stabilizing braces may be necessary if there was no improvement. (*Id.*). At a follow-up visit on June 30, 2008, Clifford reported that physical therapy "didn't really seem to help much," and Dr. Whelan opined that Clifford was unable to work because "she would be unable to squat, kneel, sit or stand for any period of time." (Tr. 365). Similarly, in August 2008, Clifford reported that neither Voltaren gel nor prescribed neoprene sleeves helped, and Dr. Whelan suggested that Clifford explore "possible patellar realignment procedures." (Tr. 364).

Clifford then sought treatment at the McClaren Clinic in November 2008, where abnormal tracking of the patella was again noted and x-rays showed degenerative changes bilaterally. (Tr. 369-73).

In January 2009, Clifford began treating with Dr. James Park. (Tr. 442). On examination, she ambulated with a slight left-favored gait and had "slight genu valgum deformity [of the] bilateral lower extremities." (*Id.*). Dr. Park also noted positive grinding and crepitus with flexion and extension of the bilateral knees (left greater than right) and positive patellar apprehension, and he diagnosed Clifford with osteoarthritis of the bilateral knees. (*Id.*).

In February 2009, Clifford underwent a consultative examination with John Tofaute, M.D. (Tr. 374-80). Dr. Tofaute observed that Clifford walked with a knock-kneed gait and slouched forward because of a moderately severe amount of thoracic kyphosis. (Tr. 375). In addition, Clifford had bilateral patellar crepitus in both knees, as well as palpable swelling in the

5

right knee. (*Id.*). Squatting was limited, with audible popping of the left knee. (*Id.*). Dr. Tofaute opined that Clifford would be limited in terms of sitting, standing, bending, stooping, carrying, pushing, and pulling, and her clinical signs supported a need for a walking aid when she was more symptomatic. (Tr. 377-78).

Clifford was also seen by James Donovan, M.D. during orthopedic grand rounds at McLaren Regional Hospital in March 2009. (Tr. 446-48). Dr. Donovan noted that Clifford was knock-kneed when standing, and walked with a very slow gait (wincing at times). (Tr. 447). He found "notable crepitus" with both active and passive range of motion of the knees. (*Id.*). X-rays showed "severe lateral compartment arthritis of both knees, [] a little more significant on the right than on the left" and an obvious valgus deformity. (Tr. 446).

Clifford returned to see Dr. Park on March 27, 2009, at which time her patellar apprehension test was grossly positive, with crepitus and lateral tracking malformation. (Tr. 442). Dr. Park diagnosed patellofemoral syndrome with lateral tracking abnormality. (*Id.*). Subsequently, Clifford again received injections in her knees, but they provided no lasting relief. (Tr. 444-45).

When Clifford returned to see Dr. Whelan in June 2009, x-rays reviewed narrowing of the lateral compartments (right greater than left) and severely lateral tracking patellas bilaterally. (Tr. 443). Dr. Whelan indicated that total knee arthroplasty was discussed, but she felt Clifford was "much too young" for such a surgery. (*Id.*). At that time, Dr. Whelan recommended work restrictions that included a sit/stand option and no prolonged standing or sitting. (*Id.*).

Clifford continued treating at McLaren but switched to Dr. Kathleen Perkins in October 2009. (Tr. 467). At that time, Clifford reported still worsening knee pain. (*Id.*). On examination, Dr. Perkins found knee joint tenderness on palpation, bilateral crepitus, and pain on

6

range of motion and motor testing. (*Id.*). In January 2010, Clifford again reported worsening knee pain; she had a mild limp and limited range of motion and was again referred to an orthopedist. (Tr. 463-64). In February 2010, Dr. Perkins approved her for a handicapped parking permit. (Tr. 461-62).

On March 5, 2010, Clifford was seen by Seann Carr, M.D.[3] at Family Orthopedic Associates. (Tr. 389-91). Dr. Carr noted tenderness to palpation, and bilateral x-rays confirmed a "significant valgus deformity with loss of the lateral compartment as well as some narrowing of the anterior compartment[.]" (Tr. 390). Dr. Carr diagnosed moderate bilateral knee osteoarthritis with significant valgus deformity. (*Id.*). She too discussed total knee arthroplasty with Clifford but noted that this "would be the first of many surgeries in her lifetime" due to her relatively young age. (Tr. 391).

Clifford then switched from Dr. Perkins to Dr. Alexander Rodriguez at McLaren in April 2010. (Tr. 453-54). In June 2010, Dr. Rodriguez completed a Medical Needs form for the Michigan Department of Human Services, opining that Clifford could not work in any job for at least three months. (Tr. 393-94).

Between June 2010 and September 2010, Dr. Carr administered a series of cortisone injections to Clifford's knees, but she noted that they were becoming less effective as time went on. (Tr. 472-78). During that period of time, Clifford was "quite desperate for pain management," and Dr. Carr commented that, although she was very young for a knee replacement, "given the severity of her disease it is certainly an option." (Tr. 477, 478). By January 2011, Dr. Willson indicated that Clifford had failed both cortisone injections and viscosupplementation, thereby exhausting all non-operative treatments. (Tr. 509). Dr. Willson

---

[3] Dr. Carr subsequently became known as Dr. Willson.

7

further stated:

> She is really struggling with her activities of daily living. Because of this she now lives with her parents who help her with her activities of daily living, as well as taking care of her young son. At this point surgery would be her next step. However, she is extraordinarily young and understands that a total knee arthroplasty only lasts 10 to 15 years and she is not ready to proceed with surgery at this point.

(*Id.*). When she returned to Dr. Willson in June 2011, Clifford was still having difficulties with her activities of daily living. (Tr. 507). X-rays showed a "complete loss of her lateral compartment bilaterally with an impressive valgus deformity" and small periarticular osteophyte formation, as well as narrowing of her anterior compartment bilaterally. (*Id.*). Dr. Willson again noted that surgery was a "less than [] ideal treatment option" for Clifford because she would "require multiple additional surgeries in her lifetime[.]" (*Id.*).

On February 27, 2012, Dr. Rodriguez wrote a letter opining that Clifford had limitations of: no lifting or squatting, no stair climbing, and no sitting or standing for long periods of time. (Tr. 510). Dr. Rodriguez further opined that Clifford "is at risk for further health complications should she not follow the above recommended limitations." (*Id.*). Clifford continued to treat with Dr. Rodriguez throughout 2012, 2013, and 2014, and at various times over the years, he noted the existence of knee pain, abnormal gait, swelling, stiffness, decreased range of motion, and knee warmth. (Tr. 511-42, 566-631).

On January 22, 2013, Dr. Rodriguez gave a sworn statement in this matter, confirming that he had been Clifford's primary care physician since April 2010. (Tr. 546-47). He noted a diagnosis of degenerative joint disease in both knees, but stated that Clifford's most severe complaints had to do with "dislocation of the patella" in the right knee. (Tr. 547). Dr. Rodriguez also noted that the cushion between the femoral and tibial bones in Clifford's knees had worn away, with significant compartment loss, which would cause great pain with kneeling, squatting,

8

and bending and unbending of the knees. (Tr. 550-51, 557-58). Dr. Rodriguez testified that Clifford would not be capable of performing normal, competitive employment, explaining:

> The time, standard time sitting, the time that she needs to rest, the amount of pain, the medication that she's taking to control the pain, and all the discomfort and therapy needed in order to continue living, daily living, plus any amount of pressure into the knee, standing, walking, or doing any activities will decrease the life of that knee, increase the discomfort in the knee, and chances for her to go into a replacement is going to be sooner. And that's something we're trying to avoid, because we know she's too young for a replacement.

(Tr. 560).

### 3. *Vocational Expert's Testimony*

James Engelkes, Ph.D. testified as an independent vocational expert ("VE") at the 2015 hearing. (Tr. 59-63). The ALJ asked the VE to imagine a claimant of Clifford's age, education, and work experience who can perform sedentary work, with the following additional limitations: can occasionally bend, turn, crouch, and stoop; cannot climb, squat, kneel, or work around moving machinery or unprotected heights; and requires a job affording a sit/stand option at will and allowing the use of a hand-held device, such as a cane. (Tr. 61). The VE testified that the hypothetical individual would be capable of working in the jobs of cashier II (180,000 jobs nationally), addresser (90,000 jobs), and ticketing clerk (150,000 jobs). (Tr. 61-62).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Clifford is not disabled under the Act. At Step One, the ALJ found that Clifford has not engaged in substantial gainful activity since August 2, 2007 (the alleged onset date). (Tr. 16). At Step Two, the ALJ found that she has the severe impairments of arthritic changes and deformity of the bilateral knees, flat feet, obesity, and thoracic kyphosis. (*Id.*). At Step Three, the ALJ found that Clifford's impairments, whether considered alone or in combination, do not meet or medically equal a Listing. (Tr. 19).

9

The ALJ then assessed Clifford's residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work, with the following additional limitations: can occasionally bend, turn, crouch, and stoop; cannot climb, squat, kneel, or work around moving machinery or unprotected heights; and requires a job affording a sit/stand option at will and allowing the use of a hand-held device, such as a cane. (*Id.*).

At Step Four, the ALJ determined that Clifford is not capable of performing her past relevant work. (Tr. 21). At Step Five, he concluded, based in part on the VE's testimony, that Clifford is capable of performing a significant number of jobs that exist in the national economy. (Tr. 22). As a result, the ALJ concluded that Clifford is not disabled under the Act. (Tr. 23).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's

decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

### F. Analysis

As the ALJ recognized, in Dr. Rodriguez's January 2013 sworn statement, he "endorsed as reasonable, various of [Clifford's] alleged limitations (e.g., required unscheduled breaks;

11

could sit only 10 minutes; could only stand or walk ten minutes; could lift no more than five to ten pounds, etc.)." (Tr. 21 (citing Tr. 543-64)). The ALJ also noted Dr. Rodriguez's opinion that Clifford would not be capable of sustaining competitive employment "due to the time she needed to rest, due to her pain, due [to] her medication, etc." (Tr. 21, 560). However, the ALJ gave limited weight to Dr. Rodriguez's opinion primarily because, while there were "some objective knee findings," Dr. Rodriguez's "notations did not reveal neurological dysfunction[.]" (Tr. 21). Clifford now argues that the ALJ erred in evaluating Dr. Rodriguez's opinion and in "repeatedly discount[ing] radiographic evidence of the severity of [her] condition …." (Doc. #12 at 16). For the reasons set forth below, the Court agrees.

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v.*

12

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

Here, the ALJ primarily discounted Dr. Rodriguez's opinion as unsupported by the medical evidence, noting that, while the record contained "some objective knee findings," Dr. Rodriguez's notes "did not reveal neurological dysfunction, or other basis to conclude [Clifford] was unable to perform all substantial gainful activity." (Tr. 21). There are several problems with this statement. First, in lumping together numerous significant medical findings under the vague description of "some objective knee findings," the ALJ did not fairly characterize the record evidence. As discussed above, *supra* at 4-9, these "objective knee findings" include x-rays that consistently revealed significant problems in Clifford's knees that worsened over time, from degenerative changes in 2008 (Tr. 361-62), to severe lateral compartment arthritis in 2009 (Tr. 443), to complete loss of the lateral compartment of the knees bilaterally by 2011 (Tr. 507). In addition, both Clifford's treating physicians and the consultative examiner consistently noted crepitus from 2008 forward (Tr. 359, 366, 375, 442, 447, 467), and there were repeated observations of a severe valgus deformity that negatively impacted Clifford's gait (Tr. 375, 390, 442, 447, 507).

In addition to unfairly minimizing these "objective knee findings," the ALJ mischaracterized other large portions of the record. For example:

- The ALJ stated that, in June 2008, "it was reported [that Clifford] had made some progress relative to her knees, with involvement in a short course of physical therapy[.]" (Tr. 17 (citing Tr. 365)). What the June 30, 2008 treatment note actually states, however, is that "physical therapy didn't really seem to help much …." (Tr. 365). Indeed, at this same visit, Dr. Whelan opined that Clifford was unable to work because "she would be unable to squat, kneel, sit or stand for any period of time." (*Id.*).

- The ALJ further observed that, at a visit to Dr. Whelan on August 14, 2008, Clifford's "ligaments, sensation, circulation and skin exams were benign[.]"

13

(Tr. 17 (citing Tr. 364)). While this might have been true, the ALJ failed to mention that, at that same visit, Dr. Whelan diagnosed Clifford with severely maltracking patella with chondromalacia of the bilateral knees and referred her "for possible patellar realignment procedures." (Tr. 364).

- The ALJ characterized Clifford's March 2009 knee x-rays as showing "bilateral degenerative changes." (Tr. 17). In actuality, these x-rays showed "severe lateral compartment arthritis of both knees, [] a little more significant on the right than on the left" and an obvious valgus deformity. (Tr. 446).

- Similarly, the ALJ stated that, at a June 4, 2010 visit to Dr. Carr, Clifford "reported good benefit" from a cortisone injection. (Tr. 18 (citing Tr. 478)). While that might have been true on that single occasion, the ALJ made no mention of Dr. Carr's subsequent treatment notes, which indicate that these injections became less effective over time and that as a result Clifford was "quite desperate for pain management." (Tr. 477).

- The ALJ cited a February 2011 treatment note, where Dr. Rodriguez found that Clifford had normal sensation and no overt neurological dysfunction. (Tr. 18 (citing Tr. 531-32)). However, he failed to discuss Dr. Willson's findings – less than one month earlier – that she had failed both cortisone injections and viscosupplementation, thereby exhausting all non-operative treatments, and was still "really struggling with her activities of daily living." (Tr. 509).

- Likewise, the ALJ cited findings from a June 2011 visit to Dr. Willson, where Clifford was "alert, fully oriented, well appearing and in no acute distress" and had "unimpaired" dorsiflexion and plantar flexion. (Tr. 18 (citing Tr. 507)). The ALJ omitted all mention of Dr. Willson's contemporary note that x-rays showed a "complete loss of her lateral compartment bilaterally with an impressive valgus deformity" and small periarticular osteophyte formation, as well as narrowing of her anterior compartment bilaterally. (Tr. 507).

Given all of these facts, the Court cannot conclude that the ALJ fairly and accurately discounted Dr. Rodriguez's opinion as unsupported by the objective evidence of record. Rather than acknowledging and addressing medical evidence that potentially conflicted with his findings, the ALJ failed to mention or address significant portions of the record. And, while it is true that an ALJ need not address every piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, he does not fairly discharge his duties when he fails to discuss significant contradictory portions of the very records on which he relies most heavily. *See Minor v. Comm'r of Social Sec.*, 2013 WL 264348, at *17 (6th Cir. Jan. 24, 2013) (citing *Germany-Johnson v. Comm'r of*

*Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) and *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011)).

The ALJ also discounted Dr. Rodriguez's opinion because he "appeared to rely heavily on [Clifford's] subjective complaints," which he found less than fully credible.[4] (Tr. 21). The Commissioner argues that this was appropriate, asserting that instead of providing his own opinion as to Clifford's functional limitations, Dr. Rodriguez "merely testified that [Clifford's] own statements about her functioning were credible." (Doc. #15 at 10 (citing Tr. 21, 554-57)). Having reviewed Dr. Rodriguez's sworn testimony, however, the Court disagrees that this is the case. With respect to Clifford's limitations, Dr. Rodriguez testified as follows, in relevant part:

> Q. [Ms. Clifford has testified] that as much as three to five times per day she has to take these time-off breaks or simply become nonfunctional to recuperate from pain, and those being in the area of even 15 minutes, and that they're unscheduled…. Is that a credible statement from the Jennifer Clifford that you treat as a patient?
>
> A. Correct.
>
> Q. Is it because of the pain from the knee condition, the knee diagnosis?
>
> A. Correct.
>
> Q. In terms of her exertional capacities, she has also indicated that if she sits for more than approximately ten minutes, she's sort of into the squirming and moving in regard to the knees and the stiffening of the knees. Does that sound credible and like a normal statement from her?
>
> A. That's correct.
>
> Q. In regard to standing or walking approximately ten to 15 minutes, let's say she's at a store or a bank or something more than ten to 15 minutes, in genuine pain, genuine change in her level of symptoms is occurring, does that sound credible for the Jennifer Clifford you're treating?

---

[4] Because the Court finds that Dr. Rodriguez did not rely heavily on Clifford's subjective complaints, it need not address her arguments regarding the credibility of these complaints. (Doc. #12 at 19-21). On remand, however, the ALJ should thoroughly reevaluate Clifford's subjective complaints.

15

> A. Yes. For this type of diagnosis, yes.
>
> Q. In regard to lifting, she has testified that somewhere between five to 8 pounds is sort of her maximum. Beyond that, she is going to experience pain in the knees and as it radiates from the knees. Is that a fair statement from her? Is that an accurate statement the way you know her?
>
> A. That's a statement that if she's claiming, we'll take it, but I don't have a way to measure how much she can or not lift. I think five to 10 pounds is adequate, what she's mentioned.
>
> Q. Stairs, she indicates that she has a very difficult time, has, in fact, fallen, and certainly seeks to avoid stairs. Is that something you would expect from this condition?
>
> A. Yes. That's something that we advise also to prevent all those steps, stairs, kneeling on a frequent basis.
>
> \*    \*    \*
>
> Q. Her ability to stoop and crouch, could you help us understand what she might be left with in terms of ability?
>
> A. Yeah. If we go back a little bit, patients who are already obese and they lose the flexibility. Now, she lost a lot of weight but she still lacks laxity of the joints. On top of that, we have a joint that is decreased in protection with the cartilage and with that even further, the flexibility. And for those, the pain is great when you're trying to kneel, squat, bend, unbend the knee, due to the pain because cartilage protects your joint. Without cartilage, you're touching bone to bone, and that's where the pain is.

(Tr. 554-58).

Although the questions posed to Dr. Rodriguez perhaps could have been phrased more artfully (and in a non-leading manner), the most reasonable interpretation of Dr. Rodriguez's testimony is that he was confirming that Clifford's statements about her limitations were consistent with his own findings, as opposed to simply opining that Clifford was telling the truth about those limitations. (Tr. 554-58). Where he could not so state – for example, as to Clifford's testimony regarding how much she could lift – Dr. Rodriguez did more than simply indicate that he believed her, instead noting that he did not have a means to independently determine how

16

much she could lift. (Tr. 556). And, certainly, with respect to limitations on standing, walking, stooping, crouching, kneeling, stair climbing, squatting, and bending and unbending the knee, it does not appear that Dr. Rodriguez's opinion is based on Clifford's "subjective complaints" at all but, rather, on his own medical knowledge and findings. (Tr. 510-631). Where Dr. Rodriguez had reviewed multiple x-rays, examined Clifford on numerous occasions over the years, and received copies of at least some of Dr. Carr's reports (e.g., Tr. 500, 508), there is a firm objective basis for his opinion, and it is improper to construe his testimony as merely opining as to Clifford's credibility.[5]

For all of these reasons, the Court cannot conclude that the ALJ properly applied the treating physician rule or that his decision is supported by substantial evidence. Accordingly, remand is warranted.

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be DENIED, Clifford's Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Recommendation.

---

[5] In an attempt to bolster the ALJ's decision to give limited weight to Dr. Rodriguez's opinion, the Commissioner argues that his opinion that Clifford was not capable of performing any work was not entitled to "any special significance," as this is an opinion on a matter reserved to the Commissioner. (Doc. #15 at 10 (citing 20 C.F.R. § 404.1527(d)(1))). While this argument might state an accurate legal principle, its underlying factual premise is flawed because both in his prior opinion (Tr. 510) and in his sworn statement (Tr. 554-58), Dr. Rodriguez opined as to specific functional limitations with respect to sitting, standing, lifting, squatting, and stair climbing. Thus, this argument too is without merit.

Dated: May 25, 2017  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 25, 2017.

s/Eddrey O. Butts  
EDDREY O. BUTTS  
Case Manager